## GARLOCK v. MARKHAM.

*(Supreme Court, General Term, Fifth Department. April 11, 1890.)*

NEGOTIABLE INSTRUMENTS—CONSIDERATION—BONA FIDE PURCHASERS.

In a suit against the maker by a purchaser for value, before maturity, of a note given in consideration of a contract, which from its nature was improbable and speculative, where the evidence shows that defendant was induced to make the note by fraudulent representations of the payee, and is conflicting as to whether plaintiff knew of such fraud at the time of his purchase, a verdict for defendant will not be disturbed. Following *Watson* v. *Blossom*, 4 N. Y. Supp. 489. CORLETT, J., dissenting.

Appeal from Monroe county court.

Action by William Garlock against Samuel Markham. There was a judgment for defendant, and plaintiff appeals.

Argued before DWIGHT, P. J., and MACOMBER and CORLETT, JJ.

*Garlock & Beach,* for appellant. *John Desmond,* for respondent.

PER CURIAM. Judgment and order appealed from affirmed. See the case of *Matson* v. *Blossom, ante,* 225.

CORLETT, J., (*dissenting.*) On the 26th day of October, 1886, the defendant executed and delivered his promissory note as follows: "Thirteen months after date, I promise to pay James Orcutt or bearer, seven hundred and fifty dollars, payable at North Parma, value received, with interest at six per cent. S. W. MARKHAM." The consideration of the note was 50 bushels of Bohemian oats purchased by the maker on the day of its date at $15 per bushel, and a bond, of which the following is a copy:

"No. 9.                    Capital Stock, $100,000.00.

"HOME OFFICE, YPSILANTI, Mich.

"A bond from the Bohemian Oat and Cereal Company, incorporated under the laws of the state of Michigan, December 21st, 1884. Know all men by these presents, that the Bohemian Oat and Cereal Company do hereby agree to sell one hundred bushels of oats for Mr. S. W. Markham at $15.00 per bushel, in cash or by note, for which said S. W. Markham is to pay 33⅓ per cent. commission for selling, said commission to be paid in notes, for which said grain is sold, on or before October 26th, 1887; the price on this grain being a fictitious value, for speculative purposes. In testimony whereof, the said Bohemian Oat and Cereal Company has caused this bond to be signed and sealed by the superintendent of said company this 26th day of October, 1886. This company will not be responsible for any outside contracts made by agents, other than those expressed on the face of this bond. This bond is void without the company seal, and signature of superintendent.

[L. S.]                    "J. M. ORCUTT, Superintendent."

The oats were worth about 30 cents a bushel. The plaintiff purchased the note about five days after its date, paying therefor $675. The defendant made default in payment. This action was brought and was tried in the Monroe county court, before the special county judge and a jury, in February, 1889. The jury found a verdict for the defendant. The plaintiff made a motion for a new trial, which was denied. Judgment was entered, and the plaintiff appeals to this court. The complaint was on the above note. The answer admitted execution and delivery of the note, but put in issue the plaintiff's allegations of ownership before maturity, also alleges that the transaction was a wager and illegal, also alleges fraud and fraudulent representations as a bar, and fourth, usury. The alleged fraudulent represen-

tations were that the authorized agents of the Bohemian Oat & Cereal Company represented to the defendant that the company was a corporation duly organized under the laws of the state of Michigan, and it was worth $100,000 over and above its debts and liabilities, and that the company paid its obligations as they matured. It alleges the falsity of these representations, and that the plaintiff took the note with knowledge of all the foregoing facts. On the trial no question was made but that the plaintiff bought the note and paid the sum above stated. The evidence on the part of the defendant tended to show that the plaintiff, before purchasing the note, frequently stated, in conversation with various persons, in substance, that the whole scheme was a fraud. The contract between the defendant and the company was a speculative one, and a fictitious value was purposely placed on the oats. The inducement which the defendant had to enter into the contract was the expectation of making money enough out of the transaction named in the bond to pay his note at maturity, and make a profit of $250, less interest on his note, and also the 50 bushels of oats which were delivered to him. The scheme on the part of the company was to get notes from those to whom they sold oats, get the money, and then, if it was compelled to buy the oats named in the bond, it expected to sell for the full speculative value, and make a profit of $33\frac{1}{3}$ per cent., so that, if the scheme prospered, the buyer would make money, and the seller both in selling and buying. The evidence tended to show that various persons made money who went into the scheme, and that the company or its agents also made large profits. It does not appear that there was any default on the part of the company before the transaction with the defendant. It further appeared by the evidence that the defendant sowed the oats he purchased, and raised more than enough to deliver for sale the 100 bushels mentioned in the bond, but it does not appear that he notified the company or its agents that he had the oats, or that he desired to sell them in pursuance of the terms of the bond. The real contention on the trial was whether the agents of the company practiced a fraud upon the defendant at the time he bought the oats, and whether the plaintiff knew of this fraud at the time he purchased the note. The defendant denies any knowledge of fraud on his part until after he sowed the oats, which must have been in the spring after the plaintiff purchased the note; and the plaintiff denies all knowledge of fraud upon the defendant, either by representations or otherwise. The theory of the defendant, upon the trial, was that the character of the transaction itself, without regard to representations, was of such an extraordinary nature as to arouse suspicion, and be some evidence of fraud. The defendant also claimed that he was deceived by the alleged fraudulent representations of the agents as to incorporation of the company, its capital and solvency.

The trial judge, in his rulings and charge, proceeded upon the assumption that the jury could take into consideration, and place importance upon, the terms of the contract. It is very clear that the defendant was as well acquainted with the nature of the contract as the company or its agents. He knew its purport and scope, and entered into it for the purpose of making money, the same as the other party. He was, therefore, in no position to urge its inflated terms as a fraud upon him; he being a party, with full knowledge of its contents. It is a familiar rule that fraud cannot be predicated upon facts known to exist by the party alleged to be defrauded. *Studer* v. *Bleistein*, 115 N. Y. 316, 22 N. E. Rep. 243. Speculative or wild-cat schemes have often flourished with large profits to those engaged in them, although a prudent man could readily see that an explosion, sooner or later, was inevitable. Credulity and avarice often accompany each other; and the persons possessing these attributes are frequently the most successful, with people similarly organized, in working up and carrying on schemes which they expect will secure large results to them, and that, when disaster comes, other people will be the victims. On this branch of the case there is no dis-

tinction, unless it may be in ability and cunning, between the company, its agents, and the defendant. They all had equal knowledge of the fictitious and speculative nature of the transaction, and were working together for the same purpose. If, however, fraudulent representations as to the financial condition of the company were made to, and relied upon by, the defendant, fraud may be predicated upon them by him; and if, from that cause, damage resulted, there is no reason why he ought not to have relief. On the trial, however, this branch of the case was not separated from the other; and each was treated as equally available to the defendant in his contention that a fraud was practiced upon him. It is evident that, if the company performed the obligations assumed in its bond, no damage would be sustained by the defendant. The defendant, for the reasons already stated, is in no position to allege fraud on the ground that he had a right to assume, or was justified in believing, that the company would not perform its contract, on account of its romantic and extravagant character. He was as much responsible for that as the other party. The only ground, therefore, upon which he can legitimately claim that it would not perform, is on account of its financial condition. But that was not the theory upon which the case was tried or submitted to the jury. It was, in part at least, disposed of on the assumption that the defendant had a right to believe that the contract would not be performed, on account of its peculiar provisions. In response to a juror's question, the court, in the charge on this branch of the case, states: "But it is a fact to be taken into consideration by you in determining the character of the transaction, and considering the probability of a safe, prudent, conservative, business man entering into it as a business transaction." This was excepted to by the plaintiff's counsel. In making these remarks the trial judge referred to the weight which might be attached to the terms of the contract in reaching a result as to whether the contract would be performed, and as to whether there was fraud in the transaction. The plaintiff's counsel requested the court to charge "that, if the jury find from the evidence that plaintiff had not faith that the company would perform its contracts and redeem its bonds which it did or might issue on its first operations in the fore-part of the year 1886, and afterwards his confidence and belief in its performance was established and restored and confirmed, in the fall of 1886, so that, at the time he purchased the note, he believed the company intended to pay and redeem its bond given to Markham, then plaintiff was not at all affected by his former lack of confidence in performance by the company." The court declined so to charge, and the plaintiff's counsel excepted. The defendant had given evidence tending to show that before the purchase of the note the plaintiff had no confidence in the company's performance or ability to perform. It is very clear that if, before buying the note, he altered or changed his views, it would have an important bearing on the question of his honesty and *bona fides* in making the purchase. The defendant's evidence tended to show the plaintiff's belief. If evidence of that nature was pertinent, what his belief was at the time of the purchase would be controlling. Men's beliefs fluctuate. What they are when they act in important matters determines the question of good faith.

The trial judge was also requested to charge that the plaintiff "was not bound to be on the alert for facts which might constitute a defense to the note at the time he bought it." The court declined, and the plaintiff's counsel excepted. The cases are all adverse to this ruling. *Welch* v. *Sage,* 47 N. Y. 143; *Lord* v. *Wilkinson,* 56 Barb. 593; *Mabie* v. *Johnson,* 8 Hun, 309. The court was also asked to charge by the plaintiff's counsel "that the buying of the note at a fair consideration for it, without notice, at the time of purchase, of the falsity of representations made to Markham, and before the maturity of the note, constitutes Garlock a holder of the note in good faith, and subsequent knowledge or notice of the representations claimed, and of their falsity,

does not affect Garlock as a *bona fide* holder, or the validity of the note in his hands." Refused, and the plaintiff's counsel excepted. It is self-evident that this exception was well taken. The plaintiff's rights must be determined by what he knew at the time of the purchase, and not by what he learned afterwards. The trial court also held that the contract might be rescinded without restoring, or offering to restore, what was received upon it after the discovery of fraud. The decisions are adverse to the position of the learned judge upon this point. *Strong* v. *Strong*, 102 N. Y. 69, 5 N. E. Rep. 799; *Schiffer* v. *Dietz*, 83 N. Y. 300. The omission to rescind would not preclude a recovery for damages occasioned by fraud, either by action or counter-claim. In some cases, where restoration is impossible after a discovery of the fraud, equity will grant appropriate relief. But in an action at law a party, on discovering the fraud, may rescind, or he may affirm and recover damages. The trial court proceeded upon the assumption that the defendant could rescind without restoring what he had received, in case it was impossible, when the fraud came to his knowledge.

Various other exceptions were taken by the plaintiff's counsel to the charge and refusals to charge, but most of them are in the same line as the exceptions above considered. Numerous exceptions were taken to the admission of evidence, mostly bearing upon the same questions. The obligation rested upon the defendant to notify the company of his being able and ready to deliver the oats for sale, according to the provisions of the bond. There was no default on the part of the company until after notice and request by the defendant. If the defense had proceeded upon the theory that damage was sustained by reason of fraud, the omission to put the company in default might have controlled the question. But the action was tried on the assumption of rescission, and the other branch of the case was not considered. It is a suggestive fact that, while the defendant claims he had no knowledge of the company's fraud, based upon the representations of its solvency, until long after the plaintiff bought the note, he still insists that the plaintiff must have known it before he purchased. An examination of the testimony shows that the plaintiff's opinions before he made the purchase rested upon the nature of the contract and its peculiarities, but it fails to show that he had actual knowledge or information as to whether the agents of the company had made fraudulent representations to the defendant on the subject of its paid-up capital or solvency. The order and judgment should be reversed, and a new trial granted in the county court, with costs to abide the event.